Teresa **MESSINA**, Nicholas Kukuc, and **A.M.**, a minor child, by and through Teresa Messina his Mother and Next Friend, Plaintiffs,

v.

**GREEN TREE SERVICING, LLC,** a Delaware Limited Liability Company, Defendant.

**Case No. 14 C 7099**

United States District Court, N.D. Illinois, Eastern Division.

Signed September 28, 2016

Roger Zamparo, Jr., Jordan M. Sartell, Zamparo Law Group, P.C., Hoffman Estates, IL, Ronald Wilcox, The Law Office of Ronald Wilcox, San Jose, CA, for Plaintiffs.

Anna-Katrina S. Christakis, Dina Marie Masiello, Jennifer Lisa Majewski, Pilgrim Christakis LLP, Chicago, IL, for Defendant.

## OPINION AND ORDER

Joan H. Lefkow, United States District Judge

Teresa Messina and her sons, Nicholas Kukuc and A.M., allege that Green Tree Servicing, LLC, in the course of servicing Messina's mortgage, violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (FDCPA) (count I), the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* (TCPA) (count II), the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat 505 *et seq.* (ICFA) (count III), the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605 *et seq.* (RESPA) (count IV),

and intruded on her seclusion (count V).[1] (Dkt. 36.) Green Tree's motion for summary judgment on all counts is now before the court. (Dkt. 95.) For the reasons stated below, Green Tree's motion is granted in part and denied in part.

## BACKGROUND [2]

In August 2005, Messina obtained a mortgage loan from First Magnus Financial Corporation. (Dkt. 97, Defendant's Local Rule 56.1 Statement of Undisputed Material Facts (Def.'s LR 56.1) ¶ 8.) Beginning in October 2005, Messina had a monthly payment due on the first of each month. According to the terms of the loan agreement, a failure to timely pay the full amount due resulted in a default. (*Id.* ¶ 10; dkt. 107, Plaintiffs' Local Rule 56.1 Statement of Additional Undisputed Material Facts (Pls.' LR 56.1) ¶ 21; dkt. 107-2, Messina Decl., Ex. 13 §§ 3(A), 6(b).)[3] Shortly after it was entered into, First Magnus assigned the loan to Bank of America (BoA). (Def.'s LR 56.1 ¶ 9.) On March 9, 2013, Messina received a letter from BoA notifying her that, beginning April 1, 2013, Green Tree would begin servicing the loan. (*Id.* ¶ 13.)

On March 19, 2013, Messina made a scheduled payment of $1,543.33; however, BoA's records incorrectly reflected that the payment was in the amount of $1,963.87. (Def.'s LR 56.1 ¶¶ 15–16; Pls.' LR 56.1 ¶ 24; dkt. 107-2, Messina Decl., Ex. 14 at TM_00159.) It is not entirely clear why, but the next day BoA issued an $832.55 overage refund check to Messina, which she cashed. (Def.'s LR 56.1 ¶¶ 17–18.) On April 16, 2013, Messina made a $1,543.33 payment, of which at least a portion was used to fully satisfy Messina's payment due on March 1, 2013. (Pls.' LR 56.1 ¶¶ 29–30.) Therefore, it was not until April 16, 2013, that, at least according to how Green Tree was tracking her mortgage, Messina became current on her March 2013 payment. (*Id.* ¶ 30; Defendant's Response to Pls.' LR 56.1 (Def.'s Resp. LR 56.1) ¶ 30.) It appears that it was the accounting of the March 19, 2013 payment that precipitated this lawsuit and led to Green Tree's allegation that Messina was perpetually $420.54 delinquent on her loan.

In the months that followed, Green Tree was in frequent communication with plaintiffs. Between April 29, 2013 and August 30, 2014, Green Tree placed more than 250 calls to plaintiffs.[4] (*See* Pls.' LR 56.1 ¶ 2.) The vast majority of these calls were

---

1. This court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367. Venue is appropriate in this district under 28 U.S.C. § 1391. All five counts are brought by Messina, whereas Kukuc and A.M. join Messina in alleging violations of the FDCPA (*see* dkt. 36 ¶¶ 36–42), TCPA (*see id.* ¶¶ 43–47), and intruding on their seclusion (*id.* ¶¶ 85–92).

2. Unless otherwise noted, the facts in this section are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to the non-moving party. The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citation omitted). In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. Any facts that are not controverted as required by Local Rule 56.1 are deemed admitted.

3. Even though the terms of the loan agreement placed Messina in default if she failed to timely pay in full, she was not assessed a late fee if the payment was received during the first fifteen days of each month. (Def.'s LR 56.1 ¶ 11.)

4. Plaintiffs' submitted two summary exhibits to their statement of additional facts detailing the number of calls. The first of these lists is based on combining "Plaintiffs' recollections and handwritten notes" with Green Tree's account notes, its dialer log, and its click-to-

placed from August to November 2013 (*see* Call Summary Chart) and were done so through one of two methods: (1) click-to-dial calls and (2) automated dialer calls. (Def.'s LR 56.1 ¶ 34.)[5] When call center agents placed click-to-dial calls they did so by either dialing the call, typing a phone number into the keypad of the agents' computer, or clicking on the telephone number on their computers. (*Id.* ¶ 39.) Regardless of the location of the call center agent, loan information, including phone numbers, were stored on a server in St. Paul, Minnesota, which call center agents accessed by logging in from their local

computers to Green Tree's UCSe user interface. (*Id.* ¶¶ 35, 38; dkt. 101-3, Sparks Decl. ¶ 6.) While the agents' computers did not store customer information, have software that allowed for telephone numbers to be called using a random or sequential number generator, or have the ability to perform predictive dialing (Def.'s LR 56.1 ¶ 37; dkt. 101-3, Sparks Decl. ¶ 6), a call center agent could nonetheless participate in a dialer campaign from their local computer.

Dialer campaigns were conducted through a combination of hardware and

---

dial log. (Dkt. 107–1, Sartell Decl. ¶ 6.) The second of these exhibits is solely based on the Green Tree records and does not include contributions from plaintiffs. (*Id.* ¶ 7.) Plaintiffs have not submitted any underlying records that form the basis of their "recollections and handwritten notes" and, therefore, must be relying on Federal Rule of Evidence 1006, which allows parties, under certain circumstances, to submit summaries of records to prove their content when the records are so voluminous that they could not be conveniently examined by the court. Plaintiffs, however, have not laid the needed foundation for the admission of such a summary, as they have not established that the records relied on are so voluminous that they cannot be submitted. Further, plaintiffs' appear to be relying on both their own recollections and handwritten notes. To the extent that plaintiffs are merely relying on recollections that were incorporated into no document other than the summary, they have failed to make clear how that recollection could be a "writing[ ], recording[ ], or photograph[ ]" that may be incorporated into a summary under Rule 1006. Lastly, given that there is some ambiguity as to what documents plaintiffs are actually relying on, it is not clear that Green Tree has been given an opportunity to examine the document as required by Rule 1006.

As such, the court will rely on the second summary exhibit, as the underlying records were submitted to the court. While Green Tree objects to this exhibit as well, the objection is not well-founded, as Green Tree attempts to shortcut its analysis by taking issue with the entirety of the exhibit, but only referencing a single inaccuracy (call # 9). (*See*

Def.'s Resp. LR 56.1 ¶ 2.) The court agrees that the entry identified by Green Tree is inaccurate, and thus strikes that entry from the exhibit. The remainder of the exhibit, however, appears to generally be accurate. First, in response to another statement of additional facts, Green Tree admitted the accuracy of the bulk of the exhibit detailing calls made from August 30, 2013 through November 19, 2013. (*See id.* ¶ 9.) Second, the court has reviewed the underlying records for the remaining forty-seven calls on the log and, other than a few isolated errors in which the date, time, or phone number listed was slightly off, the court finds it necessary to strike only call numbers 9, 13, and 17. Green Tree duplicated this summary exhibit with some additional information, and it is that summary exhibit, with the adjustments indicated above, that the court will refer to when referencing Green Tree's telephone calls. (*See* dkt. 116-1, Christakis Decl., Ex. 27 (Call Summary Chart).)

5. While plaintiffs dispute Green Tree's description of its telephone systems, they do so without citation to admissible evidence. (*See* dkt. 108, Plaintiffs' Response to Def.'s LR 56.1 (Pls.' Resp. LR 56.1) ¶¶ 34–54.) Green Tree's description of its systems, which is supported by a declarant with personal knowledge, is therefore admissible. Further, it appears that plaintiffs' issue with Green Tree's description of its phone system is less about the description itself and more about the parties' disagreement over the legal significance of that description. (*See id.* ¶ 34 (citing response brief).)

software located in Tempe, Arizona and St. Paul, Minnesota. (Def.'s LR 56.1 ¶¶ 43–44.) For a dialer campaign to proceed, a Green Tree employee would determine criteria to be used to identify the phone numbers to be called; then the phone numbers that fit within those criteria would be transferred in a data file to the dialer. (*Id.* ¶¶ 44–45.) To participate in a campaign, a call center agent would log on to the predictive dialer from the UCSe interface. (*Id.* ¶ 46.) If the dialer detected that a live person answered the phone, it would then transfer the call to an available, logged-in call center agent. (*Id.* ¶ 47.) Call center agents did not have the ability to initiate dialer campaigns, which could apparently be initiated either at a national or regional level (*see id.* ¶¶ 48–51).

Green Tree called plaintiffs using both of the above-described methods, resulting in 167 calls to Messina (including 158 between August and November 2013), 56 to A.M. (including 54 between August and November 2013), and 39 to Kukuc (all of which were placed from August to November 2013). (*See* Call Summary Chart.) All of the calls placed to Kukuc and A.M. were click-to-dial calls, whereas 57 of the calls placed to Messina were dialer calls. (Call Summary Chart; dkt. 107-1, Sartell Decl., Ex. 9 (Green Tree Dialer Log) at GT0001–04.) At least when not answered, Green Tree often would not identify that it placed the call by leaving a message. (*See* Pls.' LR 56.1 ¶ 4; dkt. 107-1, Sartell Decl., Ex. 8 (Green Tree Account Notes).)

It is not necessary to detail each of these calls, but some are relevant to whether plaintiffs consented to Green Tree's calls. On July 19, 2013, a call center agent placed a click-to-dial call to Messina, during which Messina declined call back permission. (*Id.* ¶ 59.) On August 2, 2013, Green Tree placed another click-to-dial call to Messina. (Def.'s LR 56.1 ¶ 61; Call Summary Chart at 1.) Green Tree's account notes indicate that Messina gave Green Tree permission to call her back (Def.'s LR 56.1 ¶ 60), but Messina disputes that characterization and supports her dispute with her own recollection as well as the account notes that indicate that she was uncooperative, referenced her attorney, and refused to be provided with Green Tree's contact information (*see* Pls.' Resp. LR 56.1 ¶ 60; dkt. 107-2, Messina Decl. ¶ 13; Green Tree Account Notes at GT0038–39). On August 26, 2013, Green Tree placed another click-to-dial call to Messina, in which it asked for call back permission. (Pls.' LR 56.1 ¶ 7.) Messina replied, "Yes. As long as I'm not being harassed." (*Id.* ¶ 7; Def.'s Resp. LR 56.1 ¶ 7.) Three days later, on August 29, 2013, another click-to-dial call was placed to Messina. (Pls.' LR 56.1 ¶ 8.) This time, when Green Tree asked for call back permission, Messina replied, "Yeah. Have them call me when they have an answer, not when they want me to sit on the phone so they can read notes and see and try to figure this out. It doesn't take that long. I work for a bank. I do this for a living." (Pls.' LR 56.1 ¶ 8; dkt. 107-1, Sartell Decl., Ex. 7 (Telephone Tr.) at 28:24–29:5.) She reiterated this same sentiment later in the conversation:

> **Green Tree:** We'll give you a call back. Is that okay?
>
> **Messina:** Yes.
>
> **Green Tree:** Okay. I do apologize.
>
> **Messina:** When somebody has an answer, not to call me and go you're short $400-some when [*sic*]—researched this because I've given enough information.

(Telephone Tr. at 29:21–30:3.) The narrative description in the account notes indicate this nuance, yet the call back permission field only contains a "Y." (Green Tree Account Notes at GT0035.) From September 17, 2013 through October 14, 2013, a number of unanswered calls (click-to-dial

and dialer) were placed to Messina. (Green Tree Account Notes at GT0029–33; Call Summary Chart at 2–7.)[6] On October 15, 2015, Green Tree made contact with Messina and, according to Green Tree's account notes, Messina made a payment and provided call back permission, a fact that Messina appears to dispute. (Pls.' LR 56.1 ¶ 15; Green Tree Account Notes at GT0028–29; dkt. 107-2, Messina Decl. ¶ 7.)[7] This same pattern repeated the next month, until Messina answered a click-to-dial call on November 15, 2013. (Pls.' LR 56.1 ¶ 16; Green Tree Account Notes at GT0024–28.) During the call, a call center agent told Messina, "And no more calls for you. Okay. That was me calling you those times just to let you know." (Telephone Tr. at 93:3–5.) Nothing in the transcript reflects that Messina was asked for or provided call back permission; nonetheless Green Tree's account notes indicate that she provided such permission during that call. (Green Tree Account Notes at GT0024.) Following this conversation, on November 19, 2013, Green Tree placed one more dialer call to Messina, during which she communicated to Green Tree that it only had permission to call back her attorney. (Pls. LR 56.1 ¶ 16; Telephone Tr. at 95:13–15; Green Tree Account Notes at GT0024.)

During much of this time period, Messina was making payments to Green Tree over the telephone because, as a result of her default, she was not permitted to make same-day payments in any other manner. (See Pls.' LR 56.1 ¶ 42; dkt. 107-2, Messina Decl. ¶¶ 26–28.) When she did so, Green

Tree required Messina to pay "a $12 Speedpay vendor's fee." (Def.'s Resp. LR 56.1 ¶ 42.) The fee was not hidden, as call center agents disclosed its existence prior to charging Messina. (See, e.g., Telephone Tr. at 89:23, 109:3, 114:2–3, 120:20–21.) Nothing in the record indicates that Messina was restricted from mailing in payments or that she would have ·been charged a fee for doing so. (See dkt. 107-1, Sartell Decl., Ex. 20.) From the submissions made by the parties, it is unclear whether all or part of the $12 fee was retained by Green Tree or the entirety of the fee was passed through to a third-party processor.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550

---

6. Just prior to this period, on September 13, 2013, a click-to-dial call was answered by Messina, and Green Tree's account notes indicate that she gave call back permission (Green Tree Account Notes at GT0033). Green Tree discussed this call for this first time in its reply brief. (See dkt. 120-2 at 5.) Therefore, the court will not rely on it to establish the existence of any new consent.

7. This dispute need not, and probably should not, be resolved on summary judgment. While Messina discusses the October 15, 2013 call at some length, Green Tree does not appear to be relying on that call to establish call back permission. (See, e.g., Call Summary Chart at 7–8.)

U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare*, 629 F.3d at 704.

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548.

## ANALYSIS

### I. Fair Debt Collection Practices Act (Count I)

■ Green Tree's basis for moving for summary judgment on Messina's FDCPA claim is that the FDCPA does not apply to Green Tree because it is not a "debt collector" as to Messina's loan because the loan was not in default when Green Tree began servicing it. The FDCPA's definition of debt collector is not all-encompassing and excludes any person collecting or attempting to collect "a debt which was not in default at the time it was obtained by such person." 15 U.S.C. § 1692a(6)(F). Green Tree argues that Messina was not in de-

fault when it began servicing the loan because BoA had not declared Messina to be in default.[8] This is not the relevant standard. Although the Seventh Circuit has not definitively held as much, it has looked favorably on decisions in which courts have used the definition of default in the loan agreement to determine when a loan is in default for purposes of the FDCPA. *See McKinney* v. *Cadleway Props., Inc.*, 548 F.3d 496, 502 n.2 (7th Cir. 2008) (citing approvingly to and construing *Alibrandi* v. *Fin. Outsourcing Servs., Inc.*, 333 F.3d 82 (2d Cir. 2003), as holding "that because the FDCPA does not define 'default,' the default terms of the debt transaction itself should control"); *see also Simmons* v. *Med–I–Claims*, No. 06 C 1155, 2007 WL 486879, at *7 (C.D. Ill. Feb. 9, 2007) ("The Court recognizes that in many contractual debtor-creditor relationships, a provision of the written agreement will dictate when the debt is considered in default, rather than simply outstanding."); *Hartman* v. *Meridian Fin. Servs., Inc.*, 191 F.Supp.2d 1031, 1044 (W.D. Wis. 2002) (finding default under the FDCPA because a default existed under the clear terms of the contract). One district court in this circuit has cautioned against importing the terms of the loan agreement where the agreement gave discretion to the creditor/debt collector to decide when a loan went into default. *See Magee* v. *AllianceOne, Ltd.*, 487 F.Supp.2d 1024, 1027–28 (S.D. Ind. 2007). That, however, is not the case here, where

---

**8.** In reply, Green Tree also argues that Messina admitted in her complaint that she was not in default at the time it started servicing the loan. (Dkt. 120–2 at 3.) Green Tree provides no citation in support of its argument, but presumably it is referring to Messina's allegation, which is also found throughout her summary judgment briefing, that she was not in default, but it was Green Tree's mistaken belief that she was in default. (*See* dkt. 36 ¶ 15.) This argument is not persuasive given that the debt was in default and that Green Tree treat-

ed the debt as through it was in default. *See Schlosser* v. *Fairbanks Capital Corp.*, 323 F.3d 534 (7th Cir. 2003) (finding that mistakenly treating a debt as though it was in default at the time the debt was acquired, subjects the debt collector to the FDCPA). This reasoning has been expressed to Green Tree in a prior decision by a court in this district. *See Bonfiglio* v. *Citifinancial Serv., LLC*, No. 14 C 9254, 2015 WL 5612194, at *10 (N.D. Ill. Sept. 23, 2015).

default is not defined so as to give the creditor/debt collector discretion.[9]

Here, the loan agreement provides that "If [Messina does] not pay the full amount of each monthly payment on the date it is due, [Messina] will be in default." (Dkt. 107-2, Messina Decl., Ex. 13 § 6(b).) Under the agreement, each monthly payment was due on the first of the month and, as discussed above, it was not until Messina's $1,543.33 payment on April 16, 2013, that she fully satisfied the amount she owed on March 1, 2013. Since Messina was in default at the time Green Tree began servicing the loan on April 1, 2013, Green Tree is a debt collector under the FDCPA.[10]

Accordingly, Green Tree's motion for summary judgment on count I is denied.

## II. Telephone Consumer Protection Act (Count II)

■ Green Tree argues that it is entitled to summary judgment on plaintiffs' TCPA claims because the Act only applies to the calls placed by its dialer, and whenever Green Tree made such calls it had consent to do so. Absent the express prior consent of the called party, the TCPA prohibits any person from calling a cellular telephone using an automatic telephone dialing system (ATDS). 47 U.S.C. § 227(b)(1)(A)(iii). An ATDS is defined as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.* § 227(a)(1). What could be an otherwise straightforward statute, is made difficult by potential differing interpretations of the word "capacity." As recently as last year, the FCC provided further guidance as to the meaning of this word and in doing so reaffirmed its "previous statements that dialing equipment generally has the capacity to store or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of 'autodialer') even it is it not presently used for that purpose, including when the caller is calling a list of consumers." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7971–72 (July 10, 2015) (2015 TCPA Order).

In its declaratory ruling and order, the FCC rejected proposed interpretations that called for limiting "capacity" to present ability, as such an interpretation "could create problems for enforcing the TCPA's privacy protections with regard to proving how a system with multiple functions was actually used for multiple calls." *Id.* at 7576. As such, the FCC confirmed its "broad interpretation of 'capacity' to include 'potential ability.'" *Id.* at 7975. The FCC did place some limits on its broad interpretation, stating that, "although the Commission has found that a piece of equipment can possess the requisite 'capacity' to satisfy the statutory definition of 'autodialer' even if, for example, it requires the addition of software to actually perform the functions described in the definition, there must be more than a theoretical potential that the equipment could be modified to satisfy the 'autodialer' definition." *Id.* In interpreting the 2015 TCPA Order, a court has noted, "The FCC's order does not suggest that a system that never operates without human intervention constitutes an ATDS under the statute. To the

9. Green Tree took an inconsistent position on this issue in the past, arguing in *Heffron v. Green Tree Servicing, LLC*, No. 15 C 996, 2016 WL 47915, at *3 (N.D. Ill. Jan. 5, 2016), that a declaration by a lender that a consumer was in default should be disregarded when determining whether the debt was in default at the time Green Tree began servicing the debt.

10. Green Tree does not argue, and there is no indication in the record, that it "acquired" the loan for purposes of the FDCPA prior to the date it began servicing it.

contrary, the 2015 TCPA Order reiterates that the basic functions of an autodialer are to dial numbers *without human intervention*, and to dial thousands of numbers in a short period of time." *Derby* v. *AOL, Inc.*, No. 5:15–cv–00452–RMW, 2015 WL 5316403, at *4 (N.D. Cal. Sept. 11, 2015).

Courts in this district have reached different conclusions when determining on summary judgment whether Green Tree's click-to-dial system is an ATDS. *Compare Modica* v. *Green Tree Servicing, LLC*, No. 14 C 3308, 2015 WL 1943222 (N.D. Ill. Apr. 29, 2015), *with Robinson* v. *Green Tree Servicing, LLC*, No. 13 C 6717, 2015 WL 4038485 (N.D. Ill. June 26, 2015). *Modica*, 2015 WL 1943222, at *2–3, concluded that Green Tree was entitled to summary judgment on the plaintiffs TCPA claim because the additional task of logging into the dialer precluded a finding that the click-to-dial system was an ATDS:

> Consequently, Plaintiffs argue, Ferguson [i.e., the call center agent] had the capacity to auto-dial customer's [*sic*] numbers such that she was using an ATDS. However, as in *Dobbin*, Ferguson would not have had the capacity to make auto-dialed calls unless at least one additional step was taken: Ferguson would have to log into the Dialer. It is true that the additional step of logging into the Dialer is minimal–even smaller than in *Dobbin*. Nonetheless, Ferguson did not take that step and the equipment

Ferguson used to call Plaintiffs was not capable of dialing numbers without human intervention.

Two months later, *Robinson*, 2015 WL 4038485, at *3–4, denied cross-motions for summary judgment on the plaintiff's TCPA claim finding, without much explanation, that there was "a genuine issue of material fact with respect to whether any calls were made using equipment which had the requisite capacity to act as an ATDS as defined by the TCPA.[11] In the end, a summary judgment ruling is tied to the evidence that is properly before the court and here there is a lack of proof as to how the equipment used to place click-to-dial calls is an ATDS. Plaintiffs argue that the dialer and the equipment Green Tree used to place click-to-dial calls are a single interconnected system and, therefore, regardless of what feature of that system is being used at any given point in time, the system as a whole remains an ATDS. In support of this argument, plaintiffs have cited testimony from a Green Tree representative that explains that, for a call center agent to participate in a dialer-initiated call, the agent first needs to log in to the UCSe interface (which is used for click-to-dial calls) and then, from that interface log into the dialer. As *Modica* found, and before that *Dobbin* v. *Wells Fargo Auto Finance, Inc.*, No. 10 C 268, 2011 WL 2446566 (N.D. Ill. June 14, 2011),[12] the ability to log in does not on its

---

**11.** Plaintiffs attack *Modica* by arguing that it was decided before the 2015 TCPA Order. True enough, but *Robinson* was also decided before the order's release date. Likewise, Green Tree tries to distinguish *Robinson* by arguing that there were issues of consent in that case and that the court "did not address the significant human intervention required to place a call using the click-to-call method." (Dkt. 120–2 at 10.) While consent was at issue in *Robinson*, consent had nothing to do with the court's resolution of whether the click-to-call method was an ATDS. Further, the court noted that the FCC had previously discussed

the relevance of human intervention but nonetheless concluded that there were genuine issues of material fact. *Robinson*, 2015 WL 4038485, at *4.

**12.** In *Dobbin*, the court granted summary judgment to the defendants even though desk phones were physically connected to the automatic dialing system and could be operated independently of the automatic dialing system, where there was no evidence that calls were made using the automatic dialing system.

own merge pieces of equipment. And here, plaintiffs have presented no other evidence as to how the equipment used to make click-to-dial calls could be modified such that it could automatically place calls. Without such evidence, no reasonable jury could conclude that the click-to-dial equipment is an ATDS, as plaintiffs have done nothing more than allege a theoretical possibility as to how the click-to-dial equipment could be modified.

This determination is consistent with the TCPA's purpose: "As the Commission has previously recognized, the purpose of the requirement that equipment have the capacity to store or produce telephone numbers to be called is to ensure that the restriction on autodialed calls not be circumvented." 2015 TCPA Order at 7516 (internal quotation marks omitted). Here, the TCPA's requirements are not being circumvented as Green Tree uses one system to place click-to-dial calls and another to place autodialer calls, which are separately tracked. Since only click-to-dial calls were placed to A.M. and Kukuc, Green Tree is granted summary judgment as to their TCPA claims.

■ Green Tree argues that although its dialer calls to Messina were made using an ATDS, it nonetheless is entitled to summary judgment because Messina consented to receiving these calls. As illustrated by the background section, genuine issues of material fact remain as to whether Messina consented to Green Tree's calls following her denial of call back permission on July, 19, 2013. In the calls that Green Tree relies on to establish call back permission, there is either a dispute as to whether permission was granted or the extent of the permission granted. As such,

Green Tree is not entitled to summary judgment as to Messina's TCPA claim stemming from Green Tree's dialer calls.

Accordingly, Green Tree's motion for summary judgment on plaintiffs' TCPA count is granted to allegations relating to the click-to-dial calls but is otherwise denied.

### III. Illinois Consumer Fraud and Deceptive Business Practices Act (Count III)

■ The ICFA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices … [used] in the conduct of any trade or commerce." 815 Ill. Comp. Stat. 505/2. "The elements of a claim under the ICFA are: '(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce.'" *Wigod* v. *Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012) (quoting *Siegel* v. *Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010) (citing *Robinson* v. *Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960, 201 Ill.2d 403, 266 Ill.Dec. 879 (2002))). A plaintiff must also show that the unfair or deceptive conduct is the proximate cause of an injury and, in the case of a private plaintiff, that "actual pecuniary loss" was suffered. *Camasta* v. *Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2014). Here, where unfair, as opposed to deceptive, conduct is alleged,[13] "[t]o determine if a given course of conduct is unfair, the court must consider '(1) whether the practice offends public policy; (2) whether it is immoral, unethical, op-

---

**13.** In its opening brief Green Tree argued that Messina could not prevail on a deceptive conduct claim because she continued to maintain that she was not perpetually $420.54 delinquent on her mortgage and, therefore, was not deceived by Green Tree. In her response, Messina appears to concede this point and instead focuses on Green Tree's alleged unfair conduct.

pressive, or unscrupulous; (3) whether it causes substantial injury to consumers.'" *Osborn* v. *J.R.S.–I., Inc.*, 949 F.Supp.2d 807, 813 (N.D. Ill. 2013) (quoting *Robinson*, 266 Ill.Dec. 879, 775 N.E.2d at 961). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson*, 266 Ill.Dec. 879, 775 N.E.2d at 961 (quoting *Cheshire Mortg. Srv., Inc.* v. *Montes*, 612 A.2d 1130, 1143–44, 223 Conn. 80 (1992)).

Messina argues that Green Tree engaged in unfair practices by repeatedly calling her without her consent and by requiring a $12 service fee when she made mortgage payments over the telephone.

## A. Calling Without Consent
### 1. Offends Public Policy

■ "A practice which has not previously been held to be unlawful can offend public policy if it violates a standard of conduct set out by an existing statute or common law doctrine that typically governs such situations. *W. Ry. Devices Corp.* v. *Lusida Rubber Prods., Inc.*, No. 06 C 52, 2006 WL 1697119, at *4 (N.D. Ill. June 13, 2006). Here plaintiffs argue that Green Tree has offended public policy because it has violated the TCPA. *See Centerline Equip. Corp.* v. *Banner Pers. Serv., Inc.*, 545 F.Supp.2d 768, 780 (N.D. Ill. 2008). As discussed above, a genuine issue of material fact remains as to whether Green Tree's dialer calls violated the TCPA. Construing the facts in plaintiffs' favor, as the court must for the non-movant, the court will assume that this factor weighs in plaintiffs' favor.

### 2. Immoral, Unethical, Oppressive, Or Unscrupulous

■ "Conduct is oppressive only if it imposes a lack of meaningful choice or an unreasonable burden on its target." *Id.* Courts have found that receiving unconsented-to communications can leave consumers without alternatives because without turning off their device they cannot avoid receiving the communication. *See, e.g., id.* Some courts in this district have held that limited unconsented-to contacts do not rise to an oppressive level. *See, e.g., G.M. Sign, Inc.* v. *Elm Street Chiropractic, Ltd.*, 871 F.Supp.2d 763, 769–70 (N.D. Ill. 2012) (holding that receiving a one-page unsolicited advertisement was not unreasonable and collecting cases); *but see Sadowski* v. *Med1 Online, LLC*, No. 07 C 2973, 2008 WL 2224892, at *7–8 (N.D. Ill. May 27, 2008) (dismissing notion that two one-page faxes with removal instructions cannot be oppressive as a matter of law because the Illinois Supreme Court has instructed that the ICFA is to be interpreted liberally and if such conduct were deemed not oppressive as a matter of law, there would be nothing to compensate the recipient for the injury). Again, construing the facts in plaintiffs' favor, Messina may be able to prove that she received upwards of fifty unconsented-to dialer calls. Further, even though that number of click-to-dial calls may not offend public policy because they do not violate the TCPA, a reasonable factfinder could find it oppressive. Accordingly, this factor too weighs in plaintiffs' favor.

### 3. Substantial Injury To Consumers

■ "A practice causes substantial injury to consumers if it causes significant harm to the plaintiff and has the potential to cause injury to a large number of consumers." *G.M. Sign*, 871 F.Supp.2d at 770 (quoting *Stonecrafters, Inc.* v. *Foxfire Printing & Packaging, Inc.*, 633 F.Supp.2d 610, 617 (N.D. Ill. 2009); *see also Phillips* v. *Double Down Interactive LLC*, 173 F.Supp.3d 731, 743, 2016 WL 1169522, at *8 (N.D. Ill. 2016) ("A practice causes sub-

stantial injury 'if the injury is (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produced; and (3) one that consumers themselves could not reasonably have avoided.' " (quoting *Batson* v. *Live Entm't, Inc.*, 746 F.3d 827, 834 (7th Cir. 2014))). "Costs that are imposed on an unwilling consumer can constitute a substantial injury. Even very small individual harms can be considered substantial, if they are part of a practice that, in the aggregate, causes substantial losses to the public as a whole." *Centerline*, 545 F.Supp.2d at 780 (citations omitted).

Messina argues that "she suffered substantial injury in the form of aggravation and stress, which caused her migraines, anxiety, panic attacks, chest pains, loss of appetite, sleepless nights and made her fear that she was going to lose her job. In addition, as a result of Green Tree's conduct, she went to the doctor and had to pay out-of-pocket costs in the form of co-pays for medications, such [as] Zolpidem, and Clonazepam, Advil, and Excedrin." (Dkt. 106 at 19.) Construing the facts in Messina's favor, Green Tree's conduct—placing repeated unconsented to calls—is of the type that has the potential to cause injury to a large number of consumers, even if she may only be able to prove nominal economic harm to herself. *See People ex rel. Hartigan* v. *Stianos*, 475 N.E.2d 1024, 1029, 131 Ill.App.3d 575, 86 Ill.Dec. 645 (1985) ("While the three sales upon which this case is premised reflect only a few cents in overcharges, it is apparent that similar overcharges, if permitted to continue, could aggregate very substantial losses and injury to the consuming public."); *see also Centerline*, 545 F.Supp.2d at 781 (finding that the sending of unconsented to faxes can constitute substantial harm); *but see Thompson–Young* v. *Wells Fargo Dealer Servs., Inc.*, 2014 IL App (1st) 132479–U, ¶ 29 ("[T]he only injury alleged ... amounted to an increase in the dosage of blood pressure medication she was already taking. We fail to see how this allegation even remotely meets the 'substantial injury'-to-a-consumer criteria to sufficiently plead a cause of action for unfair practices under the [I]CFA."). Further, there is no benefit to consumers for receiving unconsented-to calls, which, by their very nature, consumers cannot avoid. Therefore, this factor too weighs in favor of Messina.

Accordingly, Green Tree's motion for summary judgment on Messina's ICFA claim relating to unconsented-to calls is denied.

### B. Service Fee
#### 1. Offends Public Policy

 Green Tree argues that the $12 service fee did not offend public policy as a matter of law. As cases cited by both Green Tree and Messina make clear, if a processing fee to pay a debt is passed through to the consumer from a third party, seeking payment of that fee is not the collection of a debt that may violate the FDCPA. *See Acosta* v. *Credit Bureau of Napa Cnty.*, No. 14 C 8198, 2015 WL 1943244, at *2–3 (N.D. Ill. Apr. 29, 2015). It is not clear from the record whether the $12 service fee was wholly or partly passed through to a third-party processor. The evidence relied on by Green Tree to establish that it was a vendor fee consists of its call center agents' generically describing the fee as a vendor fee when it sought its collection of the fee on certain occasions from Messina. Even if this were conclusive, Green Tree did not refer to the fee in this manner in all circumstances. Further, Messina maintains that the fee was not a pass-through fee. Green Tree could have submitted exhibits documenting the relationship between the alleged third party and Green Tree but did not. Therefore, construing the facts in favor of the non-

movant, the court will assume that this factor weighs in favor of Messina.[14]

### 2. Immoral, Unethical, Oppressive, Or Unscrupulous

 Green Tree also argues that the $12 fee is not unethical because Messina was not forced to pay the fee, as she could have simply mailed in her payment and avoided the fee entirely. As noted above, "[c]onduct is oppressive only if it imposes a lack of meaningful choice or an unreasonable burden on its target." *Centerline*, 545 F.Supp.2d at 780. The court finds Green Tree's argument compelling. Even during the fifteen-day grace period following defaulting on the loan, Messina could still have made her payment through the mail without having to pay the $12 service fee. Further, even if Messina wanted to wait to the last day of the fifteen-day grace period to make her payment, nothing in the record suggests that she could not have mailed in her payment and post-dated the check for the first day in which she would like funds to be withdrawn from her checking account. *See, e.g.*, *Camasta v. Omaha Steaks Intern., Inc.*, No. 12 C 8285, 2013 WL 4495661, at *9–10 (N.D. Ill. Aug. 21, 2013) (finding conduct was not oppressive when the plaintiff could not allege that he had no alternative but to purchase the product at issue); *Tudor* v. *Jewel Food Stores, Inc.*, 681 N.E.2d 6, 8, 288 Ill.App.3d 207, 224 Ill.Dec. 24 (1997) (finding conduct not oppressive because the plaintiff had an alternative to paying incorrectly scanned prices); *Saunders* v. *Michigan Ave. Nat'l Bank*, 662 N.E.2d 602, 608–09, 278 Ill. App.3d 307, 214 Ill.Dec. 1036 (1996) (finding conduct not oppressive when the plaintiff had control over whether she was to be assessed an overdraft fee). Since Messina

had a meaningful alternative, Green Tree's conduct was not oppressive.

Accordingly, this factor weighs in favor of Green Tree.

### 3. Substantial Injury To Consumers

Messina omits any argument as to how Green Tree's practice was injurious to consumers. Even if she had, the argument would fail for the same reason that the $12 service fee was not unscrupulous because consumers could reasonably avoid the charge by making payment through the mail. *See Batson*, 746 F.3d at 834 ("The third *Sperry* factor asks whether defendant's practice caused substantial injury. It does so only if the injury is . . . one that consumers themselves could not reasonably have avoided." (citing *Siegel* v. *Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010)).

Even if it is assumed that the $12 service fee offends public policy because it violates the FDCPA, this is not a situation in which the strength of the first unfair conduct factor outweighs the lack of proof as to the other two. *See G.M. Sign*, 871 F.Supp.2d at 771 ("In sum, the second and third *Robinson* factors are not outweighed by the first factor.").

Accordingly, Green Tree's motion for summary judgment is granted as to Messina's ICFA claims relating to the $12 service fee.

### IV. Real Estate Settlement Procedures Act (Count IV)

 "RESPA is a consumer protection statute that regulates the real estate settlement process, including servicing of loans and assignment of those loans." *Catalan* v. *GMAC Mortg. Corp.*, 629 F.3d 676, 680 (7th Cir. 2011). RESPA and its implementing regulations place a duty on

---

**14.** Even if the $12 fee is not a pass-through fee, its collection may still not have violated the FDCPA if the fee was "expressly authorized by the agreement creating the debt or permitted by the law." 15 U.S.C. § 1692f(1). Here there is no evidence that either of these exceptions applies.

loan servicers to respond to borrower inquiries. 12 U.S.C. § 2605(e), (k); 12 C.F.R. §§ 1024.35–.36. Under RESPA, a servicer may limit its response obligations by designating an exclusive address where it may receive borrower inquiries. *See* 12 C.F.R. § 1024.35(c); *id.* § 1024.36(b).

Six days before Messina sent her notice of error to Green Tree, new regulations became effective, which provided for two types of written requests in addition to the qualified written requests (QWRs) that existed under the previous regulations: (1) notices of error 12 C.F.R. § 1024.35 and (2) requests for information, 12 C.F.R. § 1024.36.[15] While there is significant overlap between QWRs and notices of errors and requests for information, the terms are not synonymous. The CFPB has made this clear in its official interpretation of the regulations: "A qualified written request is just one form that a written notice of error or information request may take. Thus, the

error resolution and information request requirements in §§ 1024.35 and 1024.36 apply as set forth in those sections irrespective of whether the servicer receives a qualified written request." 12 C.F.R. § 1024, Supp. I (official CFPB interpretations). This is also clear from comparing the plain language of the QWR requirements (requiring a statement of reasons) with those for notices of error (requiring the borrower to identify the error).[16] Under the regulations effective at the time Messina sent her notice of error, 12 C.F.R. § 1024.35(c) permitted a servicer to establish an exclusive designated address for receiving notices of error:

> A servicer may, by written notice provided to a borrower, establish an address that a borrower must use to submit a notice of error in accordance with the procedures in this section. The notice shall include a statement that the borrower must use the established ad-

**15.** Under the previous version of the regulations, a servicer could "establish a separate and exclusive office and address for the receipt and handling of qualified written requests." 24 C.F.R. § 3500.21(e) (2013). Green Tree relies on this version of the regulations despite the fact that they were no longer effective when Messina sent her notice of error to Green Tree. (*See* dkt. 95 at 14 (citing 24 C.F.R. § 3500.21(e)(1) (2013)).) Removal of Regulations Transferred to the Consumer Financial Protection Bureau, 79 Fed. Reg. 34,224, 34,224–25 (June 16, 2014).

**16.** Despite its assertion, Green Tree's citations to 12 C.F.R. § 1024.35(a) and *Kilgore* v. *Ocwen Loan Servicing, LLC*, 89 F.Supp.3d 526, 538 (E.D.N.Y. 2015), do not establish that notices of error are synonymous with QWRs. The regulatory cite merely provides that if a QWR asserts an error, the servicer must abide by the regulations for notices of error. 12 C.F.R. § 1024.35(a) ("A qualified written request that asserts an error relating to the servicing of a mortgage loan is a notice of error for purposes of this section, and a servicer must comply with all the requirements applicable to a notice of error with

respect to such qualified written request."). As to *Kilgore,* 89 F.Supp.3d at 538, among the questions facing the court was whether the letter qualified as a QWR and/or a notice of error, and the court noted that since the letter was not attached to the complaint it could not determine whether "the letter qualifies as a QWR or notice of error."

Further, Green Tree's statement that, "The Plaintiffs even tacitly acknowledge that the terms are synonymous as they request damages pursuant to 12 U.S.C. § 2605, which provides for damages for failure to comply with a QWR" (dkt. 120-2 at 19) misrepresents the amended complaint. 12 U.S.C. § 2605(k)(1)(E) allows for damages if a servicer "fail[s] to comply with any other obligation bound by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." In the amended complaint, Messina specifically seeks damages under 12 U.S.C. § 2605(k)(1)(E) for violations of 12 C.F.R. §§ 1024.35, .38, as allowed by § 2605(f). She does not seek damages, as Green Tree asserts, for a violation of 12 U.S.C. § 2605(e), which relates to qualified written requests.

dress to assert an error. If a servicer designates a specific address for receiving notices of error, the servicer shall designate the same address for receiving information requests pursuant to § 1024.36(b). A servicer shall provide a written notice to a borrower before any change in the address used for receiving a notice of error. A servicer that designates an address for receipt of notices of error must post the designated address on any Web site maintained by the servicer if the Web site lists any contact address for the servicer.

■ Despite the lack of complete overlap between QWRs and notices of errors, Green Tree argues that it is entitled to summary judgment on Messina's RESPA claim because Messina failed to send her notice of error to Green Tree's designated address for receiving QWRs.[17] Green Tree is forced to make such an argument given the unique timing in this case because Messina, through her counsel, sent a notice of error to Green Tree on January 16, 2014, just six days after the CFPB regulations became effective. Prior to that event, the only designated address that the record reveals Green Tree had provided to Messina was the location for receipt of QWRs. (Dkt. 97–3, Bauer Decl., Ex. B at 2 ("If you want to send a 'qualified written request' regarding the servicing of your loan to your new servicer, it must be sent to this address: Green Tree, PO Box 6176, Rapid City, SD 57709-6176.").) By its own terms, this notice does not establish an address for the receipt of notices of errors and certainly does not satisfy § 1024.32's requirement that servicer disclosures "must be clear and conspicuous." 12 C.F.R. § 1024.32(a)(1) ("Except as otherwise pro-

vided in this subpart, disclosures required under this subpart must be clear and conspicuous, in writing, and in a form that a recipient may keep."); *id.* § 1024, Supp. I ("A notice establishing an address that a borrower must use to assert an error may be included with a different disclosure, such as a notice of transfer. The notice is subject to the clear and conspicuous requirement in § 1024.32(a)(1) where the notice was not updated following the effective date of the new regulations and did not include the term notice of error."); *see also Jordan* v. *Toyota Motor Credit Corp.*, 236 F.3d 866, 867 (7th Cir. 2001) (noting in the context of the Truth in Lending Act that clear as used in clear and conspicuous "could mean 'easily understood' or some variant"). Because Green Tree did not follow the requirements to notify Messina of an exclusive address for submitting notices of error, Messina was not required to send a notice of error to the QWR address to trigger Green Tree's response obligations.

Accordingly, Green Tree's motion for summary judgment on Messina's RESPA claim is denied.

## V. Intrusion Upon Seclusion (Count V)

■ To prevail on their state-law intrusion upon seclusion claim, plaintiffs must prove "(1) an unauthorized intrusion into seclusion; (2) the intrusion would be highly offensive to a reasonable person; (3) the matter intruded upon was private; and (4) the intrusion caused the plaintiffs anguish and suffering." *Cooney* v. *Chi. Public Schools*, 943 N.E.2d 23, 32, 407 Ill.App.3d 358, 347 Ill.Dec. 733 (2010) (citing *Busse* v. *Motorola, Inc.*, 813 N.E.2d 1013, 1017, 351 Ill.App.3d 67, 286 Ill.Dec. 320 (2004)); *see also Jacobson* v. *CBS Broad., Inc.*, 2014 IL

---

17. This is the sole basis for Green Tree's motion for summary judgment as to Messina's RESPA claim. While Green Tree discusses its compliance with RESPA, it does so only in its reply brief. Therefore, the only basis for sum-

mary judgment that the court will consider is whether Messina was required to send her notice of error to Green Tree's designated address for receiving QWRs.

App (1st) 132480, ¶ 47, 386 Ill.Dec. 12, 19 N.E.3d 1165 (listing elements). Green Tree contests plaintiffs' ability to satisfy three of these elements, arguing that it is entitled to summary judgment because (1) the matter intruded upon was not private, (2) that Green Tree's actions were not highly offensive to a reasonable person, and (3) that the alleged intrusion did not cause plaintiffs' anguish and suffering.[18]

■ The court will begin with Green Tree's last argument first because it disposes of A.M. and Kukuc's claims. Plaintiffs present some evidence of injury in their statement of facts (see dkt. 106 at 8–9; Pls.' LR 56.1 ¶¶ 40–41), but A.M. and Kukuc have presented no evidence of their alleged anguish and suffering other than their own say-so. (A.M. Decl. ¶ 8 ("I was highly aggravated and annoyed of all the calls I was getting, and I just couldn't take it anymore. The calls got me really annoyed, aggravated and upset."); Kukuc Decl. ¶¶ 6–8 ("I felt harassed, abused and oppressed by Green Tree's repeated calls.... Green Tree also repeatedly called our cell phones while we were at home, which led to distress in our home and people becoming high strung and hurt.... It was a mental type of distress that affected my work and school and distracted me.").) More is needed for a plaintiff to prove actual injury. See Minter v. AAA Cook Cnty. Consolidation, Inc., No. 02 C 8698, 2004 WL 1630781, at *7 (N.D. Ill. July 19, 2004) ("Under Illinois law, to succeed on [an intrusion upon seclusion claim], [a plaintiff] must prove that the alleged intrusion 'caused anguish and suffering.' To meet her burden, '[the plaintiff] must prove actual injury in the form of, for example, medical care, an inability to sleep or work, or a loss of reputation and integ-

rity in the community.' 'Injury is not presumed.' Additionally, a causal relationship between plaintiff's anguish and defendant's alleged intrusion must be established.... The extent of plaintiff's evidence is her own statement that she felt 'angry, humiliated, frustrated and embarrassed.' This is insufficient as a matter of law." (citing and quoting Schmidt v. Ameritech Ill., 768 N.E.2d 303, 315–17, 329 Ill.App.3d 1020, 263 Ill.Dec. 543 (2002))); see also Stafford v. Puro, 63 F.3d 1436, 1445 (7th Cir. 1995) (construing United States v. Balistrieri, 981 F.2d 916, 931–32 (7th Cir. 1992) as finding that "a party's own statements can support a mental suffering award if they are more than simply conclusory," and Nekolny v. Painter, 653 F.2d 1164, 1172 (7th Cir. 1981) as "reversing emotional distress damages when supported simply by plaintiffs' statements they were depressed and humiliated"). Since A.M. and Kukuc offer nothing other than conclusional statements, they have failed to create a genuine issue of material fact as to whether they suffered anguish and suffering and, therefore, Green Tree is entitled to summary judgment on their intrusion upon seclusion claims.

■ Messina, on the other hand, has offered additional evidence as to the anguish and suffering that she endured, and there is at least a question of fact as to whether Green Tree's alleged intrusion was the proximate cause of her anguish and suffering. (Pls.' LR 56.1 ¶ 39; Def.'s Resp. LR 56.1 ¶ 39.) Even without demonstrating that Messina cannot carry her burden on damages, Green Tree maintains that it is entitled to summary judgment because the matter intruded on was not private and its conduct was not highly offensive.

---

18. In its reply brief, Green Tree also argues that the intrusion was authorized. (Dkt. 120–2 at 13.) Since this is an argument raised for the first time in reply it will not be considered. Even if the court were to consider such an argument, as previously noted there is a genuine issue of material fact as to whether the calls were authorized.

To make this privacy argument, Green Tree contends that Messina's disclosure of her debt to Green Tree, first in her bankruptcy filing and then by not filing this lawsuit under seal, means that as a matter of law she cannot maintain her claim because a matter of public record cannot be intruded upon. This argument misses the gist of Messina's claim, which is that the repeated phone calls from Green Tree regarding Messina's debt intruded upon her seclusion. Repeated, unauthorized telephone calls can give rise to an intrusion upon seclusion claim. *See Lawlor* v. *N. Am. Corp. of Ill.*, 2012 IL 112530, ¶ 22, 368 Ill.Dec. 1, 983 N.E.2d 414 (recognizing tort of intrusion upon seclusion and defining it as, "One who intentionally intrudes, physically or otherwise, *upon the solitude or seclusion of another* or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person" (emphasis added) (quoting Restatement (Second) of Torts § 652B (1977))). *Bassett* v. *I.C. Sys., Inc.*, 715 F.Supp.2d 803, 814 (N.D. Ill. 2010) ("Examples of actionable intrusion upon seclusion would include invading someone's home, illegally searching someone's shopping bag in a store, eavesdropping by wiretapping, peering into the windows of a private home, or *making persistent and unwanted telephone calls.*" (emphasis added) (quoting *Benitez* v. *KFC Nat'l Mgmt. Co.*, 714 N.E.2d 1002, 1007, 305 Ill.App.3d 1027, 239 Ill.Dec. 705 (1999))); *Fisher* v. *Quality Hyundai, Inc.*,

No. 01 C 3243, 2002 WL 47968, at *6 (N.D. Ill. Jan. 11, 2002) (construing *Thomas* v. *Pearl*, 998 F.2d 447, 452 (7th Cir. 1993) as finding that "repeated and unwanted telephone calls can constitute intrusion into seclusion"). As such, even if the subject matter of the calls—the debt—was public knowledge, Green Tree may still be liable for intrusion upon seclusion because the phone calls themselves—regardless of their subject matter—can give rise to this tort claim.[19] *See* Restatement (Second) of Torts § 652B cmt. b, illus. 5 ("A, a professional photographer, seeking to promote his business, telephones B, a lady of social prominence, every day for a month, insisting that she come to his studio and be photographed. The calls are made at meal times, late at night and at other inconvenient times, and A ignores B's requests to desist. A has invaded B's privacy."); *see also Charvat* v. *NMP, LLC*, 656 F.3d 440, 453 (6th Cir. 2011) ("Thus, with respect to content, the Ohio Court of Appeals has concluded that, even when the content of the call or transmitted material is not objectionable, the unsolicited communication itself is offensive and violative of the individual's right of privacy." (internal quotation marks omitted)).

Green Tree's argument that its conduct was not highly offensive fares no better. Messina's claim is less about the content of the calls and more about the frequency at which they were placed. As is clear from the above, persistent and unwanted phone calls can be sufficiently offensive to satisfy the requirement that the intrusion be highly offensive.[20] Green Tree placed 167 calls

---

**19.** Green Tree's argument that the only private facts "that are facially embarrassing and highly offensive if disclosed" can be intruded on (dkt. 95 at 16), fails for the same reason.

**20.** The cases Green Tree cites to suggest that phone calls from a creditor are not highly offensive are generally without a connection to the facts of this case, are discussing differ-

ent torts than at issue here, or old cases from far afield jurisdictions. *See, e.g., Pub. Fin. Corp.* v. *Davis*, 360 N.E.2d 765, 768, 66 Ill.2d 85, 4 Ill.Dec. 652 (1976) (discussing infliction of emotional distress); *Mlynek* v. *Household Fin. Corp.*, No. 00 C 2998, 2000 WL 1310666, at *3 (N.D. Ill. Sept. 13, 2000) (finding that a reasonable person would not find one phone call offensive); *Lewis* v. *Physicians & Dentists*

to Messina, including 158 between August and November 2013. Green Tree often did not leave a message when these calls went unanswered. Additionally, the calls were placed throughout the day, typically anywhere from 8:00 in the morning to 8:00 in the evening. (Call Summary Chart.) Sometimes the calls were placed with such rapid succession that a reasonable person could conclude that the caller on the other end was trying to communicate an emergency. (*See* Call Summary Chart at 8 (documenting calls placed to Messina on October 12, 2013 at 8:21 am, 8:22 am, 8:25 am, 8:31 am, 10:42 am, 10:45 am, 10:51 am, 10:52 am, 10:54 am, and 10:56 am).) Further, Messina experienced the repeated calls as harassing. (Pls.' LR 56.1 ¶ 5, 39.) Other courts have denied defendants summary judgment on similar, and even less severe, facts. *See Fausto* v. *Credigy Servs. Corp.*, 598 F.Supp.2d 1049, 1056 (N.D. Cal. 2009) (denying defendants' motion for summary judgment when the plaintiff had evidence that over ninety calls were made and the content of those calls was harassing); *Charvat*, 656 F.3d at 453–54 ("The threshold of when the number of calls becomes so persistent and frequent as to constitute 'hounding' is not clearly delineated; we cannot say as a matter of law that thirty-one calls over three months does not constitute a substantial burden.... Persisting in calling after this do-not-call request is more offensive to and likely to outrage a reasonable person."); *Masuda* v. *Citibank, N.A.*, 38 F.Supp.3d 1130, 1134–35 (N.D. Cal. 2014) (denying motion to dismiss where the plaintiff alleged receiving over 300 calls in an eight-month period even though the contents of the calls was not alleged to be offensive because the constant calls themselves could be found offensive given repeated requests that the

calls stop and that the debt collector was contacting the incorrect person); *Cf. Rush* v. *Portfolio Recovery Assocs., LLC*, 977 F.Supp.2d 414, 435 (D.N.J. 2013) (granting defendant's motion for summary judgment, in part, because there was no evidence that the defendant "placed back-to-back phone calls that would have caused Plaintiffs' phone to ring incessantly").

A reasonable jury could find that Green Tree's conduct was harassing. Accordingly, Green Tree's motion for summary judgment on plaintiffs' intrusion upon seclusion claim is granted as to A.M. and Kukuc, but denied as to Messina.

## CONCLUSION AND ORDER

For the foregoing reasons, Green Tree's motion for summary judgment is granted in part and denied in part. The motion is granted as to plaintiffs' TCPA claim based on Green Tree's click-to-dial calls and A.M. and Kukuc's intrusion upon seclusion claim. Otherwise, the motion is denied. The parties are ordered to appear at a status hearing set for October 18 at 11:00 a.m., at which time they should be prepared to discuss bringing this matter to a timely resolution.

---

*Credit Bureau*, 177 P.2d 896, 899, 27 Wash.2d 267 (1947) (generally discussing the right to privacy and stating that a telephone call to a third-party did not invade the plaintiff's right

of privacy); *Jackson* v. *Peoples Fed. Credit Union*, 604 P.2d 1025, 1028, 25 Wash.App. 81 (1979) (discussing infliction of emotional distress).