In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-1560

JAMES BATSON,

*Plaintiff-Appellant,*

*v.*

LIVE NATION ENTERTAINMENT, INC., *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 1226 — **Gary S. Feinerman**, *Judge.*

ARGUED NOVEMBER 14, 2013 — DECIDED MARCH 25, 2014

Before WOOD, *Chief Judge*, and CUDAHY and ROVNER, *Circuit Judges*.

WOOD, *Chief Judge*. James Batson walked up to Live Nation's box office at the Charter One Pavilion in Chicago and purchased a non-refundable ticket to see O.A.R., a popular American rock band. Ticket in hand, he realized that the ticket price included a $9 parking fee for a spot he did not want. Believing that the bundled $9 fee was fundamentally unfair, he sued on behalf of himself and a proposed class.

**I**

Batson's original complaint alleged claims under federal antitrust and California unfair competition law. When Live Nation moved to dismiss that action, Batson responded with an amended complaint, which the district court accepted. The amended complaint dropped the federal antitrust and California unfair competition theories. Relying on the jurisdiction supplied by the Class Action Fairness Act, 28 U.S.C. § 1332(d)(1), Batson substituted a single claim that Live Nation had committed an unfair practice in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act or Act), 815 ILCS 505/2. (Batson is a citizen of New York; each of the defendant corporations is incorporated in Delaware and has its principal place of business in California.) The amended complaint criticizes the 2010 merger between Live Nation and Ticketmaster (a transaction that was not blocked by the Department of Justice), but its primary target is Live Nation's tying of a parking charge to each concert ticket. Batson insists that the mandatory parking fee is unfair under the Consumer Fraud Act because it forces consumers to purchase the parking or forego the concert. Live Nation again moved to dismiss, arguing this time that Batson failed to state a claim under the Consumer Fraud Act under the standards set out by the Supreme Court of Illinois in *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951 (Ill. 2002). The district court agreed and dismissed, and Batson now appeals. We affirm.

**II**

The facts underlying Batson's complaint are straightforward. On July 10, 2010, Batson purchased a ticket for a concert by O.A.R. from Live Nation's box office at the Charter

One Pavilion in Chicago. After the transaction was complete, Batson spotted on the face of the ticket a notation that a $9 parking fee was included in the price. Indeed, it is undisputed that every single ticket sold for that concert reflected the same information: of the total price, $9 was designated as a parking fee, whether or not the buyer needed to park a car. Batson had no car to park; he had walked from downtown Chicago to the concert venue and had bought the ticket immediately before the concert. As far as we know, Batson attended the concert, but the sting of the mandatory parking fee stayed with him, leading to this lawsuit.

### III

We review a district court's decision granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) *de novo*. *Stayart v. Yahoo! Inc.*, 623 F.3d 436, 438 (7th Cir. 2010).

Illinois's Consumer Fraud Act is intended to protect consumers from unfair methods of competition and other unfair and deceptive business practices. See *Robinson*, 775 N.E.2d at 960. It is liberally construed to effectuate its purpose. *Id.* Batson chose to proceed under an unfairness analysis, as he was entitled to do: "A plaintiff may allege that conduct is unfair under [the Act] without alleging that the conduct is deceptive." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010) (citing *Saunders v. Mich. Ave. Nat'l Bank*, 278 Ill. App. 3d 307 (1996)).

In determining whether particular conduct is unfair, the Act dictates that "consideration shall be given to the interpretations of the Federal Trade Commission (FTC) and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." 815 ILCS 505/2; see *Robinson*, 775 N.E.2d

at 960. The most important of those interpretations are the "*Sperry* factors," which the FTC has published and the Supreme Court has cited with approval. *Id.* See *Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972). Illinois recognizes the *Sperry* test, and so we too will use it as our point of departure.

The *Sperry* factors ask whether the practice (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. *Sperry*, 405 U.S. at 244 n.5. See also *Robinson*, 775 N.E.2d at 961. The Illinois Supreme Court has confirmed that "all three of the criteria in *Sperry* do not need to be satisfied to support a finding of unfairness." *Robinson*, 775 N.E.2d at 961; see *People ex rel. Fahner v. Walsh*, 122 Ill. App. 3d 481, 484 (1984); *Boyd v. U.S. Bank, N.A.*, 787 F. Supp. 2d 747, 751 (N.D. Ill. 2011) (citing additional Illinois state cases). Instead, citing *Cheshire Mort. Serv., Inc. v. Montes*, 223 Conn. 80 (1992) with approval, the Illinois high court has held that "[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson*, 775 N.E.2d at 418 (citing *Cheshire*, 223 Conn. at 106). Batson's claim must therefore satisfy at least one of these criteria, which we now consider.

1.   Offense to Public Policy

Batson contends that Live Nation's practice of including the price of parking in the cost of the concert ticket violates a public policy against tying, a public policy in favor of musical diversity, and one in favor of the use of alternatives to cars as methods of transportation (*e.g.,* walking or cycling) to get to concerts. We look at each in turn.

*Tying*. Batson's first argument presumes that there is a general public policy against tying, which Live Nation is violating. He insists that he is not alleging that the arrangement violates either federal or state antitrust law. See Sherman Act § 1, 15 U.S.C. § 1; Clayton Act § 3, 15 U.S.C. § 14; 740 ILCS 10/1 *et seq.* He argues that a tie-in need not violate antitrust laws in order to offend a broader public policy against tying arrangements, at least for purposes of the Act. Live Nation counters that a tying arrangement cannot violate public policy for purposes of the Consumer Fraud Act if it does not violate federal antitrust laws. In the alternative, Live Nation asserts that Batson's tying argument fails because antitrust-based claims may not be brought at all under the Act, according to *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986 (Ill. 1990).

Live Nation overreads *Laughlin,* in our view. The court there was concerned about the possibility that the Consumer Fraud Act might morph into an additional enforcement mechanism for all antitrust violations, on the theory that all such violations reflect unfair practices. It thus wrote that "[t]here is no indication that the legislature intended that the Consumer Fraud Act be an additional antitrust enforcement mechanism. The language of the Act shows that its reach was to be limited to conduct that defrauds or deceives consumers or others." *Id*. at 993. The Illinois Appellate Court followed this rule when it refused to permit a Consumer Fraud Act claim to proceed in a case filed against an alleged potash cartel. See *Gaebler v. N. M. Potash Corp.*, 676 N.E.2d 228, 230 (Ill. App. Ct. 1996). See also *Zekman v. Direct Am. Marketers, Inc.*, 695 N.E.2d 853, 859 (Ill. 1998). It remains possible, however, that an unfair practice might be covered by both the

antitrust law and the Consumer Fraud Act, and so we proceed on the basis of that assumption.

That brings us to the next question: whether, for purposes of the Consumer Fraud Act, a tying arrangement can offend a public policy against tying arrangements if it does not violate antitrust law. In this connection, it is worth recalling the developments in the antitrust law governing tying. At one time tying arrangements were thought to be so pernicious that they should be condemned as *per se* illegal, see, *e.g.*, *N. Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958), citing *Int'l Salt Co. v. United States*, 332 U.S. 392 (1947). Today, the Supreme Court takes a much more benign view of tying, recognizing that it may be procompetitive or competitively neutral, and thus that it should be illegal only if there is "sufficient power in the tying product market to restrain competition in the market for the tied product … ." *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 36 (2006). In light of that shift, we reject the idea that there is any undifferentiated policy against tying reflected in federal law, and to the extent that Illinois law follows suit, in its law.

Antitrust law has backed away from flat condemnation of tying arrangements because they are not always abusive, and when they are not, they are a legitimate method of competition. Nothing in the Consumer Fraud Act is designed to prohibit hard, but fair, competition. We can find no justification in Illinois law or policy for a rule that would ban a tying arrangement under the Consumer Fraud Act, even if that tying arrangement were found not to be anticompetitive for antitrust purposes. Nor has Batson referred us to any case in which the Illinois Supreme Court has found a tying ar-

rangement to violate Illinois public policy where that arrangement has not also violated antitrust law.

The cases on which Batson relies, *Elder v. Coronet Ins. Co.*, 558 N.E.2d 1312 (Ill. App. Ct. 1990), and *Gainer Bank, N.A. v. Jenkins*, 672 N.E.2d 317 (Ill. App. Ct. 1996), are not to the contrary. In *Elder*, the court found that denying insurance claims on the basis of a polygraph test was sufficient to state a cause of action under the Consumer Fraud Act. Although there was no specific statute prohibiting insurance companies from using polygraphs in this way, the court thought the practice offended the policy against polygraphs "as it has been established by statutes, the common law, or otherwise." *Elder*, 558 N.E.2d at 1316. In so holding, it rejected the defendant's contention that there was no established anti-polygraph policy at the time. The court concluded that "the public policy of the state as established *by case law*" rejects defendant's use of the polygraph. *Id.* (emphasis added). The problem in *Elder* was thus the use of polygraphs in ways that decisional law disapproved. In contrast, Batson cites no Illinois case in which a court has found that a tying arrangement that is permissible for antitrust purposes nonetheless violates Illinois public policy. Without such authority, *Elder* is inapposite.

*Gainer* does not help either. There, the court allowed an unfairness claim to proceed based on policies embodied in another statute that itself did not give a private right of action. It justified this step because the consumer was "not suing under the Act, but invok[ing] it merely to prove violations of the [Consumer Fraud Act]." 672 N.E.2d at 319. But Batson is not using another statute to prove a public policy violation under the Consumer Fraud Act. Indeed, he has ex-

pressly disclaimed any intent to use the federal or state anti-trust laws that way.

Batson could still prevail if the forced purchase of parking along with the concert violated antitrust law. We agree with the district court, however, that the allegations to this effect in Batson's amended complaint do not survive scrutiny under Federal Rule of Civil Procedure 12(b)(6). As we noted earlier, a tying arrangement exists when a seller exploits power over one product (the tying product) to force the buyer to accept a second product (the tied product). See *Indep. Ink,* 547 U.S. at 36–37. "Such an arrangement violates § 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 462 (1992) (internal quotation marks omitted).

Applying those principles here, we would need to find that Live Nation had enough power in some market (O.A.R. concerts? Live music concerts? Entertainment in Chicago?) to permit it to force people to spend money for useless parking rights (the tied product). But is it possible to regard O.A.R. concerts or the Charter One Pavilion as a meaningful product market? In a related context, we have held that a single popular venue is not a stand-alone relevant market. See *Elliott v. United Center,* 126 F.3d 1003 (7th Cir. 1997). We are dubious here as well that the Charter One Pavilion in Chicago has that much clout. Even if it does, however, Batson has failed to allege anything that would plausibly show that Live Nation's parking tie-in has affected a substantial volume of commerce in parking (we presume parking in Chicago, but that is unclear). Indeed, Batson all but concedes

this point and instead invites us to break new ground by finding that a tying arrangement violates federal antitrust law if its anticompetitive effect is felt in the tying product market. We decline the invitation. We are not the arbiters of fair prices for Illinois, and if the requisite market power is missing, the antitrust laws do not prohibit a seller from asking consumers to pay a higher price for a package.

*Musical Diversity; Walking.* Batson also argues that Live Nation's parking tie-in violates public policy in favor of musical diversity and the encouragement of walking to concerts. He is grasping at straws. First, as the district court found, the musical diversity argument was forfeited because it was perfunctory and underdeveloped. Even on the merits, there is nothing to these assertions. While Illinois no doubt supports both musical diversity and walking, the Consumer Fraud Act is concerned with public policy as established by statutes and the common law. *People ex rel. Fahner*, 122 Ill. App. 3d at 484. The link between those *desiderata* and the $9 parking fee is far too tenuous to take this point seriously.

### 2. Immoral, Unethical, Oppressive, or Unscrupulous

The relevant inquiry here is whether a defendant's conduct is "so oppressive as to leave the consumer with little alternative except to submit to it … ." *Robinson*, 775 N.E. 2d at 961. As the district court saw, this element is not satisfied if a consumer can avoid the defendant's practice by seeking an alternative elsewhere. See, *e.g.*, *Siegel*, 612 F.3d at 936 (citing *Robinson* for the proposition that oppression cannot be proved if plaintiff could have avoided the defendant's penalty provisions by going elsewhere to lease a car).

Batson contends that he was not informed of the exist-
ence of the charge until *after* he purchased his non-
refundable ticket and saw "$9 PRK PAID" on its face. As-
suming this is true, as we must, we will assume that there
was no way he could avoid paying that $9. This fact, how-
ever, cuts both ways. When Batson purchased the O.A.R.
ticket he was told that it would cost a particular amount, and
he paid that amount. It was only later that he realized what
he paid "for the ticket" actually bundled the costs for the
ticket and parking. (Indeed, it probably bundled much more:
there may have been an opening act before O.A.R. took the
stage; the Charter One Pavilion might have had a policy
banning outside food or drink; and so on.) What we do
know is that Batson was willing to pay the face price in or-
der to see O.A.R. He may be trying to argue that he paid an
overcharge in the amount of $9, but there is nothing in this
record to indicate that there was anything oppressive about
the full price. Moreover, "[a]s the Supreme Court of Illinois
instructs … , 'charging an unconscionably high price gener-
ally is insufficient to establish a claim of unfairness.' *Robin-
son*, 201 Ill. 2d at 418." *Siegel v. Shell Oil Co.*, 656 F. Supp. 2d
825, 833 (N.D. Ill. 2009), *aff'd*, 612 F.3d 932 (7th Cir. 2010).

Batson offers, as persuasive authority, the district court's
opinion in *Thompson v. Fajerstein*, No. 08 C 3240, 2008 WL
4279983 (N.D. Ill. 2008), but we do not think it helps him. In
*Thompson*, the plaintiff had met with the defendant, a pur-
ported diamond buyer, and asked him to obtain a very spe-
cial diamond for his wife. The defendant agreed to do so,
asking for $150,000 up front to conduct the search. The plain-
tiff gave him the money and told him what he wanted (and
did not want) in the diamond. Defendant eventually found a
diamond that fit the bill, but he said it would cost $450,000,

$150,000 more than what plaintiff originally wanted to spend. Plaintiff said he was interested, but he asked the defendant first to provide him with a certification of the jewel's properties from the Gemological Institute of America. When plaintiff received the certificate, he found that the stone had qualities he had specifically nixed (strong blue fluorescence — something his wife did not like) and that it was actually worth only about $300,000. Plaintiff then asked for his $150,000 back, but the defendant evaded him. This is an example of abusive circumstances. The defendant in *Thompson* was holding $150,000 hostage, putting plaintiff in the position of losing that money or getting an overpriced diamond he did not want and never agreed to buy. In our case, Batson was told how much the ticket would cost before he handed over his money. Even if he learned about the $9 parking component afterwards, there is no evidence that the concert was worth any less than the face price of the ticket.

While we understand why a consumer who does not want parking would prefer to purchase a concert ticket unbundled from that benefit, there is no rule that requires everything to be sold on a fully unbundled basis. Nothing could have stopped Live Nation from erasing "$9 PRK PAID," charging $9 more for the ticket, and announcing that there was "free" parking for all who needed it. And indeed, as a result of backlash against the parking fee, it appears that Live Nation has done just that. See Hilary Lewis, *Latest Ticketing Scandal: Live Nation's Secret Parking Fee*, BUSINESS INSIDER (Mar. 18, 2009, 8:52 PM), http://www.businessinsider.com/latest-ticketing-scandal-live-nations-secret-parking-fee-2009-3 ("[Live Nation] recently unveiled a $6-per-ticket parking charge for shows at New Jersey's PNC Bank Arts Center. Yesterday, in the wake of

complaints, Live Nation eliminated the itemized fee from its Web site, only to add it to the basic ticket price.").

### 3.  Substantial Injury to Consumers

The third *Sperry* factor asks whether defendant's practice caused substantial injury. It does so only if the injury is (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) one that consumers themselves could not reasonably have avoided. *Siegel*, 612 F.3d at 935. See also *Cheshire Mort. Serv., Inc. v. Montes*, 223 Conn. 80, 113 (1992).

We assume for the sake of argument that the parking fee here meets the first two criteria. This brings us to the third question, that is, whether the fee could reasonably have been avoided. The district court found that Batson could have done so by choosing not to go to the O.A.R. concert and opting instead for alternative entertainment. While in general we agree with this analysis, there is a separate issue related to the non-refundable nature of the ticket. Batson was unaware of the parking fee before he bought the ticket, and once he learned about it, he was stuck with the purchase. That takes us back to the question whether the full price was oppressive, however, and we already have explained that there is nothing in Batson's complaint that would permit such a finding. We therefore conclude that Batson has failed to state a claim under Illinois's Consumer Fraud Act.

*********************

There are times when consumers are required to accept a package deal in order to get the part of the package they want. An airline passenger with no luggage may prefer the cost of baggage to be decoupled from the cost of a seat, and a

law student may prefer to pay lower tuition and avoid "free" pizza days. But while some people may find these bundles annoying, or even unfair, the tie is not illegal unless the standards set forth in the governing antitrust cases have been met. (Batson did not allege that the offer of a parking place was fraudulent because all places were filled; we thus have nothing to say about that or any other variation on the facts before us.) We AFFIRM the district court's dismissal of Batson's claim.