In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 21-1635

STANLEY L. FELTON, also known as G'ESA KALAFI,

*Plaintiff-Appellant,*

*v.*

LEBBEUS BROWN, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:19-cv-00319 — **Stephen L. Crocker**, *Magistrate Judge.*

———————————

ARGUED APRIL 11, 2023 — DECIDED FEBRUARY 25, 2025

———————————

Before SCUDDER, ST. EVE, and LEE, *Circuit Judges.*

LEE, *Circuit Judge.* Stanley Felton was incarcerated at the Wisconsin Secure Program Facility from 2007 until 2015. He filed a *pro se* complaint asserting numerous 42 U.S.C. § 1983 claims against several prison employees. Felton brought Eighth and Fourteenth Amendment claims against Warden Tim Haines and Gary Boughton (who, Felton alleges, succeeded Haines), based on Felton's continued detention in solitary confinement. He also alleged First Amendment claims

against three other prison officials—Lebbeus Brown, Joseph Cichanowicz, and Daniel Winkleski—claiming that they had illegally confiscated his outgoing mail.[1] The district court dismissed Felton's Eighth and Fourteenth Amendment claims after screening the complaint pursuant to 28 U.S.C. § 1915A and later denied his motion to file an amended complaint. Then, after discovery, the court entered summary judgment against him on the First Amendment claims. Felton appeals the district court's orders denying his motion to amend and granting summary judgment. For the reasons discussed below, we affirm.

## I. Background

### A. Administrative Confinement

The facts concerning Felton's time in administrative confinement are taken from his proposed amended complaint, which (for purposes of our decision) we take to be true. *See infra* at 9. At some point on or before July 10, 2013, Felton was placed in administrative confinement, a form of segregated confinement imposed for non-disciplinary purposes. *See Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008). The conditions of his confinement were severe. Among other things, he had "no free movement," "no human contact," and "limited personal property."

Under Wisconsin law, an inmate's continued detention in administrative confinement "shall be reviewed" by the Administrative Confinement Review Committee every six

---

[1] Felton also brought Fourteenth Amendment claims against these individuals for their role in his disciplinary proceedings, but he has not pursued those claims on appeal.

months. Wis. Admin. Code § DOC 308.04(10). Pursuant to this regulation, Felton was entitled to a six-month review on January 10, 2014. But he did not receive a hearing until five days later, on January 15, 2014. Based on this hearing, the committee issued an order keeping Felton in administrative segregation.

Felton appealed the order through Wisconsin's certiorari appeal process. On June 1, 2015, a judge in the Wisconsin Dane County Circuit Court granted relief and ordered a new administrative confinement hearing. The rehearing occurred on June 10, 2015. Meanwhile, Felton moved for reconsideration before the state court, asking that the confinement order be nullified. On August 28, 2015, the state court granted his motion and vacated the administrative confinement order from the January 2014 hearing, stating that "[t]he remedy for an untimely hearing is not another untimely hearing."

Shortly thereafter, Felton, who was still in segregation, filed an internal prison grievance, contending that his continued administrative confinement was illegal in light of the state court order. Boughton (who was the warden at this time) responded that he was in the process of seeking guidance from the Wisconsin Assistant Attorney General regarding the applicability of the state court's decision. Furthermore, Boughton explained, Felton was not placed in administrative confinement based on the January 2014 hearing or the June 2015 rehearing, but due to a separate hearing held on August 5, 2015 (the record contains no further information about this August 5 hearing).

On September 17, 2015, Boughton, writing for the Administrative Confinement Review Committee, informed Felton that he would remain in administrative confinement until his

planned transfer to a different institution. But this plan would soon change.

### B. Confiscated Mail

The facts concerning Felton's claim for improper confiscation of mail are taken from the summary judgment record and are construed in his favor. *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir. 2021). Shortly after the state court vacated his administrative confinement order, Felton made plans to publicize his victory. Specifically, he wanted his mother to make copies of the decision so that he could distribute it to other inmates to instruct them how to get out of segregation.

On September 20, 2015, Felton set his plan into motion. He wrote his mother a letter enclosing the state court decision and asked her to make copies. On the other side of the letter, Felton wrote a note to his brother. The note said: "This chump Michael Ray owe[s] [me] $2700…. He [is] trying to pull a move on me…. This is what I'll do for you[.] I need you to stand on this dude Gangsta Mentality and you can have $1200, sending me $1500. If I was out there[,] his mama a being missin' another son."

At the prison, all outgoing mail from inmates in administrative confinement (except for legal mail) was picked up and reviewed by staff to check for contraband and illegal communication. *See* Wis. Admin. Code § DOC 309.04(4)(a) (except for legal mail, "[i]ncoming and outgoing mail may be opened and inspected for contraband"). Suspicious mail was "regularly" routed to Brown, whose duties included investigating unsanctioned activity within the prison, for further review.

After receiving Felton's outgoing mail,[2] Brown determined that Felton's note to his brother contained threatening language, thereby violating Wisconsin prison regulations proscribing the unauthorized use of mail and the making of threats. *See* Wis. Admin. Code §§ DOC 303.49(9), 303.18(1). Brown issued a conduct report against Felton and submitted the entire contents of the envelope (both the letter with the threatening note and the state court decision) as evidence. The conduct report triggered disciplinary proceedings, in which Brown had no further involvement.

Felton's disciplinary hearing occurred on October 8, 2015; Cichanowicz served as the hearing officer. Cichanowicz, too, concluded that the letter contained threatening language and found Felton guilty of violating Wisconsin prison regulations. Cichanowicz ordered that Felton spend sixty days in disciplinary segregation and that all evidence (the letter and decision) be retained. Felton submitted an internal appeal.

The appeal went to Winkelski, the Deputy Warden. He reviewed Felton's letter and agreed with Cichanowicz's conclusion that it contained threatening language. Winkelski therefore affirmed Cichanowicz's decision.

Throughout the proceedings, the prison retained both the letter and the state court order that accompanied it. According to the defendants, when a prisoner is charged with "unauthorized mail," all contents in the mailing are kept in a single

---

[2] Felton contends that Brown targeted and personally picked up his outgoing mail, but he offers no evidence of this. Felton only notes that his envelope lacked any initials, despite a prison policy requiring third shift staff to initial and date any mail that was picked up. Even so, this lapse in policy does not suggest that Brown personally intercepted Felton's mail.

"contraband unit" for at least 120 days after the hearing, in the event the prisoner appeals.

After these proceedings, Felton's segregated status changed from administrative to disciplinary. He remained confined until November 10, 2015, when he was transferred to a different prison.

In April 2019, Felton filed a *pro se* complaint underlying this appeal. In it, he alleged that Boughton had violated the Fourteenth and Eighth Amendments by not "honoring the [state] court's order and leaving [him] in excessive confinement." Felton also alleged that Brown, Cichanowicz, and Winkelski had violated the First Amendment by confiscating his outgoing mailing and issuing "retaliator[y]" discipline.

The district court screened the complaint pursuant to 28 U.S.C. § 1915A. The court permitted Felton's First Amendment interference and retaliation claims to proceed but dismissed all claims Felton had asserted against Boughton due to his lack of personal involvement. Felton then sought leave to file an amended complaint, adding Haines as a defendant with respect to the Eighth and Fourteenth Amendment claims. The district court denied Felton's request, concluding that neither Boughton nor Haines were personally involved in any administrative confinement decisions. *See Kalafi v. Brown*, No. 19-cv-319-slc, 2020 WL 5411321 (W.D. Wis. Sept. 9, 2020).

The case proceeded, and the district court eventually granted summary judgment in favor of Brown, Cichanowicz, and Winkelski. In its order, the district court concluded that the prison's confiscation of Felton's mailing did not violate his First Amendment rights, and in any event, the defendants

were entitled to qualified immunity. Additionally, the court explained, the defendants did not discipline Felton in retaliation for his attempt to send the state court decision to other inmates but for sending a letter containing threatening language. *See Kalafi v. Brown*, No. 19-cv-319-slc, 2021 WL 877757 (W.D. Wis. Mar. 9, 2021).

Felton appealed. After reviewing Felton's *pro se* opening brief, we recruited counsel to address whether Felton had alleged a Fourteenth Amendment procedural due process claim. Eventually, counsel withdrew, citing irreconcilable differences with Felton, but filed an *amicus curiae* brief. We therefore consider the issues raised by Felton's *pro se* briefs as supplemented by *amicus curiae*. *See McCoy v. Atherton*, 818 F. App'x 538, 541 (7th Cir. 2020).

## II. Appellate Jurisdiction

Before proceeding further, we must ensure that our jurisdiction is secure. The defendants claim that Felton's notice of appeal was untimely, which would preclude appellate review. *See Bowles v. Russell*, 551 U.S. 205, 214 (2007). Felton was required to file his notice of appeal by April 8, 2021, which was 30 days after the district court's entry of final judgment. *See* Fed. R. App. P. 4(a)(1)(A). Because Felton's notice was not docketed until April 12, 2021, his appeal is considered timely only if he can benefit from the prison mailbox rule.

The prison mailbox rule provides that "a prisoner's notice of appeal is deemed filed at the moment the prisoner places it in the prison mail system, rather than when it reaches the court." *Hurlow v. United States*, 726 F.3d 958, 962 (7th Cir. 2013); *see Houston v. Lack,* 487 U.S. 266, 275–76 (1988). This rule was codified in Federal Rule of Appellate Procedure 4(c),

which requires the prisoner to provide proof of timely deposit. Such proof includes "evidence (such as a postmark or date stamp) showing that the notice was so deposited and that postage was prepaid." Fed. R. App. P. 4(c)(1)(A)(ii).

The envelope containing Felton's notice of appeal bears two stamps. One simply states "Milwaukee, WI" and is dated April 9, 2021. The other is a postage stamp for twenty cents dated April 8, 2021, from the zip code "53073." At the time Felton sent the notice, he was incarcerated at Kettle Moraine Correctional Institution, which is located in Plymouth, Wisconsin.

The facts here satisfy the prison mailbox rule. Although the envelope bears two dates—April 8 and April 9 (the latter of which would render this appeal untimely)—the April 8 postage stamp came from 53073, an area that includes Plymouth, Wisconsin, but not Milwaukee. The only "logical inference" is that Felton's envelope was deposited into the prison's mailing system on April 8 and then sent to Milwaukee on April 9 for delivery to the district court. *See Ingram v. Jones*, 507 F.3d 640, 644 (7th Cir. 2007) (relying on "logical inference[s]" to establish the prison mailbox rule's factual predicates). Thus, this appeal is timely, and we proceed to the merits.

### III. Denial of Leave to Amend

We first consider the district court's decision to deny Felton leave to amend his complaint to bring Fourteenth and Eighth Amendment claims against Haines and Boughton. The district court concluded that amendment would be futile because the proposed complaint failed to allege that Haines and Boughton were personally involved in the decision to keep

Felton in administrative confinement. *See Childress v. Walker*, 787 F.3d 433, 439 (7th Cir. 2015) (a prison official is only personally liable under § 1983 if they were "personally responsible for a constitutional deprivation").

Although we typically review a district court's decision to deny a motion to amend for abuse of discretion, when the reason is futility, we review it *de novo. See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 524 (7th Cir. 2015). Thus, we ask whether the proposed complaint plausibly alleges that Haines and Boughton violated Felton's Eighth and Fourteenth Amendment rights. *See id.* We conclude that it does not, although for slightly different reasons than the district court. As we will explain, Felton's Fourteenth Amendment claim fails because he has not adequately alleged a constitutional violation, and he has waived his Eighth Amendment claim on appeal.

### A. Fourteenth Amendment Claim

The Fourteenth Amendment prohibits the states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To establish a procedural due process claim, Felton must demonstrate: "(1) the deprivation of a liberty interest; and (2) the procedures he was afforded were constitutionally deficient." *Lisle v. Welborn*, 933 F.3d 705, 720 (7th Cir. 2019).

It is well-established that prisoners have a protected liberty interest in avoiding segregated confinement when it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Wilkinson v. Austin*, 545 U.S. 209, 222–23 (2005) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995), *overruled on other grounds by Edwards*

*v. Balisok*, 520 U.S. 641 (1997)). This turns on "the duration of the segregation and the conditions endured." *Lisle*, 933 F.3d at 721. Here, Felton was held in administrative confinement from at least July 2013 until October 2015—a period of over two years.[3] During this time, Felton was in almost complete solitude, with no human contact or free movement. *See Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697–99 (7th Cir. 2009) (segregation lasting over six months, with atypically harsh conditions, triggers a liberty interest).

The defendants ask us to ignore Felton's lengthy time in segregation and the harsh conditions therein. As they see it, Felton categorically cannot state a liberty interest because he was in discretionary confinement—that is, "segregation imposed for administrative, protective, or investigative purposes," as opposed to segregation imposed for disciplinary purposes. *Townsend*, 522 F.3d at 771; *see also Lekas v. Briley*, 405 F.3d 602, 608–09 (7th Cir. 2005). We are skeptical of this argument, especially as applied to a confinement as lengthy and severe as Felton's. In such cases, there is a significant risk that the purported administrative purpose is merely "a pretext for indefinite confinement." *Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017) (citing cases and concluding that the prisoner had a liberty interest given the "extraordinary length" of his confinement in administrative segregation); *Earl v. Racine Cnty. Jail*, 718 F.3d 689, 691 (7th Cir. 2013) (explaining that an inmate has a liberty interest when he is confined "for a significantly long time" or his conditions "are particularly harsh

---

[3]As noted, Felton's segregation status changed from administrative to disciplinary in October 2015, and he remained in disciplinary confinement until his transfer to another prison in November 2015.

compared to ordinary prison life"); *see also Marion*, 559 F.3d at 697, 697 n.2 (distinguishing *Townsend*, which found no liberty interest in transfer to administrative confinement, and other cases as "involv[ing] relatively short periods of segregation").

We need not decide this issue, however, or delve into the defendants' various arguments against Felton's asserted liberty interest. Even assuming Felton's liberty was implicated by his prolonged administrative segregation, he has not alleged that the process afforded to him was constitutionally deficient.

Notably, Felton does not take issue with the procedures surrounding his initial placement in administrative confinement. Instead, he challenges the procedures used to keep him in segregation after his arrival. Specifically, Felton claims that his detention was unlawful after January 10, 2014, because Wisconsin state law entitled him to a six-month committee review on that date, *see* Wis. Admin. Code § DOC 308.04(10), but the review did not take place until five days later. Furthermore, he remained in segregation for several months beyond that date even though he had appealed the confinement order and a state court judge had vacated it in August 2015.

The requirements of the Due Process Clause are "flexible and variable dependent upon the particular situation being examined." *Hewitt v. Helms*, 459 U.S. 460, 472 (1983), *superseded by statute on other grounds*. In the context of continued administrative confinement, inmates are entitled to "periodic review," which—like the initial placement decision—may be "an informal and nonadversary" process. *Westefer v. Neal*, 682 F.3d 679, 686 (7th Cir. 2012) (cleaned up). The frequency of this periodic review is generally committed to the discretion of prison officials, but the reviews must "be sufficiently

frequent that administrative segregation does not become 'a pretext for indefinite confinement of an inmate.'" *Id.* (quoting *Hewitt*, 459 U.S. at 477 n.9); *see Isby*, 856 F.3d at 527 (the basic question is whether the periodic review is "meaningful and non-pretextual").

Felton's only challenge to the untimely January 2014 hearing is that it was unlawful under Wisconsin law. Violations of state law, however, do not automatically establish a federal constitutional claim. *See, e.g.*, *Bradley v. Village of University Park*, 929 F.3d 875, 883, 883 n.3 (7th Cir. 2019). That means Felton must provide some reason why the prison's actions—providing a committee review six months and five days after the prior committee review—did not provide sufficient process.

On appeal, *amicus curiae* offers several reasons, but none are persuasive. *Amicus* first argues that the untimely January 2014 hearing was akin to a court without "competent jurisdiction" depriving someone of their liberty. *See Frank v. Mangum*, 237 U.S. 309, 326 (1915). But Felton has not alleged that the committee was incompetent, just that its hearing was five days late. We are mindful that due process—particularly in the prison context—is "flexible," *Hewitt*, 459 U.S. at 472, and should not entail a hypertechnical inquiry dependent on any one state statute or regulation. *Cf. Sandin*, 515 U.S. at 482 (explaining that making liberty interests overly contingent on prison regulations disincentivizes states from "codify[ing]

prison management procedures" and involves "federal courts in the day-to-day management of prisons").[4]

*Amicus curiae* also argues that Felton's due process rights were violated because he did not receive another review between his January 15, 2014 hearing and the June 10, 2015 rehearing. We assume that a seventeen-month gap between "periodic review[s]" of Felton's administrative confinement would be unconstitutional. *See Westefer*, 682 F.3d at 686 (citing cases holding a 120-day and a 30-day interval constitutionally sufficient). But nowhere does the proposed amended complaint allege that the prison either unreasonably delayed or completely deprived Felton of any required hearings between January 2014 and June 2015. Instead, he alleges rather cryptically that "[a]ny hearing done after the Jan. 15, 2014[] hearing was untimely." Furthermore, the proposed amended complaint mentions other hearings in passing (one on December 27, 2014, and another on August 5, 2015), although the reason for these hearings is unclear. What is more, Wisconsin law provides another procedural safeguard, which Felton ignores—the warden must conduct his own progress review at

---

[4] Given our conclusion, we do not reach the defendants' alternative argument that, because this violation of Wisconsin state law was "random and unauthorized," Felton could receive sufficient process through postdeprivation state remedies. *See, e.g.*, *Parratt v. Taylor*, 451 U.S. 527, 541 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *Hamlin v. Vaudenberg*, 95 F.3d 580, 584–85 (7th Cir. 1996).

least every 30 days. Wis. Admin. Code §§ DOC 308.04(10); 303.73(13).[5]

To state a due process claim, Felton must plausibly allege that the prison's procedures involving inmates in administrative confinement were constitutionally inadequate. Although we acknowledge that a *pro se* prisoner's complaint must be liberally construed, the gravamen of the proposed amended complaint was the delayed January 2014 hearing by which time, according to Felton, the review committee "lost competency." It cannot be read as broadly as *amicus* proposes.

Although Felton cannot proceed on his due process claim, we are concerned by his assertion that prison officials ignored a state court decision vacating his administrative confinement order. That said, it is not clear whether the state court's vacatur meant that Felton had to be immediately released from administrative confinement. Prison officials seemed confused as well: according to Boughton, he thought it necessary to seek guidance from the Wisconsin Attorney General's Office, which in turn filed a motion for clarification with the state court. Although it would be troubling if prison officials ignored a clear mandate issued by a court, this was not the basis of the proposed due process claim (nor was it sufficiently alleged), and we offer no view given the state of this record. As presented to us, the district court did not err when concluding that Felton did not state a Fourteenth Amendment due process claim.

---

[5] Significantly, neither Felton nor *amicus* challenges Wisconsin's review procedures themselves—that is, that due process requires something more than six-month committee reviews or monthly progress reviews. Because this issue was not briefed, we cast no judgment either way.

**B. Eighth Amendment Claim**

Felton also asserted an Eighth Amendment claim against Boughton and Haines based on the same conduct that formed the basis of the due process claim. While a due process claim challenges the procedures used to place an inmate in atypically harsh conditions, an Eighth Amendment claim alleges that the conditions themselves "amount[] to cruel and unusual punishment." *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019) (citation omitted). To establish an Eighth Amendment conditions-of-confinement claim, the prisoner must make "an objective showing that the conditions are sufficiently serious" and "a subjective showing of a defendant's culpable state of mind." *Isby*, 856 F.3d at 521 (citations omitted).

Here, the district court rejected the Eighth Amendment claim, concluding that Boughton and Haines were not involved in the committee's decision to prolong Felton's confinement. It does not appear, however, that the district court considered whether Boughton and Haines, as the warden at various points, possessed the requisite knowledge to trigger an Eighth Amendment claim. *See, e.g.*, *Antonelli v. Sheahan*, 81 F.3d 1422, 1429 (7th Cir. 1996) (at the pleadings stage, high-ranking prison officials "can be expected to know of or participate in creating systemic, as opposed to localized, situations"). This is understandable—Felton's complaint focused almost exclusively on the untimeliness of his January 2014 hearing and only briefly mentioned the conditions of his confinement.

We will assume, for present purposes, that Felton intended to bring an Eighth Amendment conditions-of-confinement claim before the district court and that his proposed

amended complaint plausibly alleges such a claim. The problem is that neither he nor *amicus* contest the district court's rejection of this claim to any meaningful degree on appeal. Felton notes in his *pro se* brief that, as warden, Boughton had the legal authority to release him from administrative confinement. But he offers no argument as to how this is sufficient to support an Eighth Amendment conditions-of-confinement claim, nor does he offer any supportive authority. *See Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("perfunctory and underdeveloped" arguments are forfeited). As for *amicus*'s opening brief, it only mentions a constitutional violation that "occurred" on January 10, 2014; does not discuss the alleged prison conditions (or Boughton's and Haines's supposed knowledge of these conditions); and cites a single case that only involves a procedural due process claim. Thus, any argument that the district court erred in rejecting the Eighth Amendment claim against Boughton and Haines was so underdeveloped as to be forfeited, if not waived. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

## IV. First Amendment Claim

Next, we consider the summary judgment against Felton as to his First Amendment claims against Brown, Cichanowicz, and Winkleski for confiscating his letter and the state court decision, which we review *de novo*. *See FKFJ*, 11 F.4th at 584. "Summary judgment is proper when there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law." *Id.* On this record, the district court properly granted summary judgment to the defendants.

The First Amendment protects a prisoner's interest in his incoming and outgoing mail correspondence. *Van den Bosch v.*

*Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011). Incoming mail is governed by the test announced in *Turner v. Safley*, 482 U.S. 78 (1987), which asks whether the prison's censorship is "reasonably related to legitimate penological interests." *Id.* at 89. Outgoing mail, however, receives greater constitutional protection and is governed by the test established in *Procunier v. Martinez*, 416 U.S. 396 (1974), *partially overruled by Thornburgh v. Abbott*, 490 U.S. 401, 413–14 (1989); *see Koutnik v. Brown*, 456 F.3d 777, 784 (7th Cir. 2006) (recognizing that *Martinez* no longer applies to incoming mail, but still applies to outgoing mail). Here, of course, we are dealing with outgoing mail.

The *Martinez* test asks two questions: (1) whether the regulation or practice furthers "an important or substantial governmental interest unrelated to the suppression of expression," such as the government's interest in "security, order, and rehabilitation"; and (2) whether the challenged action is "no greater than is necessary" to protect that governmental interest. *Martinez*, 416 U.S. at 413. Although this "no greater than necessary" language does not impose a "strict least restrictive means test," it still requires "a close fit" between the challenged action and purported interest. *Thornburgh*, 490 U.S. at 411 (cleaned up). Furthermore, when considering prison regulations, we must accord substantial deference to professional judgments and expertise of prison officials. *See Koutnik*, 456 F.3d at 785; *see also Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."); *Martinez*, 416 U.S. at 404–05 (explaining that "the problems of prisons in America are

complex and intractable" and "require expertise, comprehensive planning, and the commitment of resources").

Turning first to Felton's letter, we easily conclude that Felton's First Amendment rights were not violated by its confiscation. Each defendant reasonably interpreted Felton's letter as threatening physical harm to a person named Michael Ray. This was based on Felton's statements that Ray owed him $2,700, that Felton would pay his brother $1,200 to "stand on [Ray] Gangsta Mentality," and that if Felton was "out there," Ray's mother would be "missin[g] another son." As such, they properly concluded that Felton's letter violated Wisconsin's prison regulations prohibiting such mail.[6] *See* Wis. Admin. Code §§ DOC 303.49(9), 303.18(1). And the confiscation of the letter was not "greater than necessary" to protect the state's interest in ensuring public safety and preventing crime. *See Martinez*, 416 U.S. at 413 ("Perhaps the most obvious example of justifiable censorship of prisoner mail would be refusal to send or deliver letters concerning … proposed criminal activity, whether within or without the prison.").

Felton's primary argument is that his letter was not a "true threat" under First Amendment jurisprudence. *See United States v. Parr*, 545 F.3d 491, 496–97 (7th Cir. 2008) (explaining that the First Amendment does not protect "certain categories of speech having little or no social value," such as true threats) (citing *Virginia v. Black*, 538 U.S. 343, 358–59 (2003)). This

---

[6] To resist this conclusion, Felton offers several declarations from individuals who opine that the "stand on" statement is not threatening in "black culture." But Felton offers no explanation for the other threatening statements in his letter—namely, that Ray's mother would be "missin[g]" a son.

argument is misplaced. When determining whether the First Amendment protects an incarcerated individual's speech, we look to the tests the Supreme Court established for prisons. *See Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010) ("the question of whether a prisoner's speech is protected is governed by" the *Turner* standard); *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009) (same). Thus, what matters is not whether Felton's letter was a "true threat," but whether the letter was protected under the *Martinez* test.

The defendants' retention of the state court order that accompanied the letter is a harder question. The district court concluded that, even if their actions violated the First Amendment, the defendants were entitled to qualified immunity. Given the facts of this case, we agree.

"Qualified immunity 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 648 (7th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Thus, an official will be protected by qualified immunity "unless the plaintiff shows: '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

Focusing on the second prong, once a defendant raises the defense of qualified immunity, the plaintiff must point to "existing precedent" that "placed the … constitutional question beyond debate." *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). In

determining this, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. at 742) (emphasis in original).

Citing *Martinez*, Felton argues that his First Amendment right not to have his outgoing mail confiscated was clearly established. But, given the facts of this case, his argument conceptualizes the right in question at too high a level of generality. *See Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). Instead, the controlling question is whether it was clearly established that the First Amendment required prison officials to separate and return a noncontraband item that accompanied his contraband letter even though the two were in the same envelope.

Courts have addressed the selective confiscation of prison mail, but only in the context of incoming mail, which is governed by *Turner* rather than *Martinez*. And, in those cases, we, along with the Supreme Court, have rejected the proposition Felton espouses here that the First Amendment requires prison officials to separate and deliver non-objectionable mail rather than retain the entire mailing. *See Thornburgh*, 490 U.S. at 418–19 (prison officials reasonably believed that "tearing out the rejected portions and admitting the rest of the publication would create more discontent than the [prison's] current practice"); *Lindell v. McCaughtry*, 115 F. App'x 872, 879 (7th Cir. 2004) (rejecting a prisoner's proposal that his prison "should have redacted the offending portions of the [incoming] magazine and given him the rest"); *see also Kalafi*, 2021 WL 877757, at *12 (collecting district court cases upholding an all-or-nothing rule for incoming mail, and noting that there is little to no caselaw concerning this rule for outgoing mail).

Given the dearth of cases regarding outgoing mail and the cases that reject the notion that prison officials have a duty to separate out non-objectionable content in the context of incoming mail, we cannot say that the defendants' obligation to do so here was clearly established. At base, this is not the type of "obvious" First Amendment violation, *see Kemp*, 877 F.3d at 352, that would preclude qualified immunity.

Undeterred, Felton argues that the defendants are not entitled to qualified immunity because the prison's policy, which the defendants invoke, did not exist. But he offers no evidence for this proposition. Although Felton points to various instances in which he claims that the policy was not applied to him and other inmates, none of these situations involved an inmate who faced discipline for mailing out contraband alongside noncontraband.

Additionally, Felton provides no evidence that the defendants acted with an improper or retaliatory motive. Nothing in the record indicates that Cichanowciz and Winkleski were aware of Felton's plan to distribute the court decision to other inmates. *See Delapaz v. Richardson*, 634 F.3d 895, 900 (7th Cir. 2011) (to have a retaliatory motive, the defendants must have actual knowledge of the protected activity). And, although Brown may have confiscated an earlier letter Felton had sent to another inmate discussing his plan to disseminate the state court decision, Brown's role here was limited to issuing the conduct report and submitting the letter and order to Cichanowciz, the hearing officer responsible for deciding how to handle the evidence. *See Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020) (to state a First Amendment retaliation claim, there must be a "causal link" between the protected activity and the adverse action).

## V. Conclusion

For the foregoing reasons, we AFFIRM.